Okay, all right. Oh my goodness. Case 16-1204, E.T. Products, LLC v. D.E. Miller Holdings, Inc., Et al. Ms. Brady, come on up. I always feel like a game show host when I say that. May it please the court, my name is Holly Brady and I'm with the law firm of Haller & Colvin and I'm accompanied by my partner, Mark Giacquina. We represent E.T. Products in their claim that Doug and Tracy Miller violated the non-compete agreements provided as part of the $5 million asset purchase agreement. It's our position that the district court erred when it found that the Millers did not violate the restrictive covenants and that Petroleum Solutions was not directly or in the fuel additive business. Isn't the language of the non-compete argument so overbroad that it could encompass actions that are really wholly unrelated to business? For instance, its terms would preclude the Millers from indirectly assisting any person who invests in any venture that indirectly engages in the business anywhere in North America. So if, let's say the Millers help a friend move into a new house and that friend is an investor in a venture that indirectly engages in the business, then wouldn't that violate the provision? I mean, to survive, shouldn't the language at least limit the assistance to that related to business? No. No, Your Honor, and here's why. The intent of the parties was that the Millers would be out of the fuel additive business and that they would not provide assistance that could somehow turn into competition. Certainly moving a friend into a home is not the type of activity that the restrictive covenants were intended to prohibit, and the problem with the district court's opinion is that it fails to give effect to the intent of the parties. As the district court stated, the Blakemore family and ET Products wanted to buy the Millers' business and they wanted to buy them out of the business. They paid $5 million in exchange for the business and the Millers' agreement that they would not be involved in the fuel additive business, including terms like directly or indirectly are routinely included and even non-competes in the employment context. It was entirely appropriate to include them in a sale of a business context. While the court followed the appropriate standard in looking at the intent of the parties when considering the enforceability of the restrictions, the court did a complete 180 then when it was interpreting the restrictions and determining whether or not a violation had occurred. All of a sudden, the court began strictly construing the restrictions against ET Products. The district court's decision to construe those restrictions strictly against ET Products was in violation of even the party's own agreement. Your Honors, if you look at page 35 of the Asset Purchase Agreement, which can be found at page 91 of the Supplemental Appendix, the Asset Purchase Agreement expressly provides, quote, no rule of strict construction shall be applied against any party, end of quote. The district court did exactly the opposite. The district court strictly construed the restrictions against ET Products when determining whether or not a violation exists. The district court's decision to apply that standard is contrary to Indiana law. If you look at the opinion, the district court includes a quote from Fogel v. Shaw stating that the restrictions should be strictly construed against the Covenant T. But if you read Fogel v. Shaw, the quote that the district court is relying upon is talking about restrictive covenant strictly construed in the other direction, in the way that Judge Rovner's question is probing. But taken to its logical extreme, the extremely broad language of this restrictive covenant would prohibit exactly the hypothetical that she gave you about providing assistance in the nature of moving into a new home if the person who's receiving that assistance is engaged in the fuel additive business. And that can't possibly be a reasonable construction of this language under Indiana law. I mean, there have to be some boundaries. Yes, you bargained for a broad restrictive covenant, but it's got to be reasonably construed, and it has to have some boundaries. Yes, Your Honor, I would agree. We're not asking that it be strictly construed against the Millers. That's what you want for the period both before the fall of 2012 and after the fall of 2012, because the Millers stopped assisting Kuhns and Petroleum Solutions after you cut them off as your distributor. Up until that point, they were entitled to, because you can't get relief for anything the Millers did when Petroleum Solutions was acting as your distributor. That's just an absurd construction of the restrictive covenant, not to compete here. So what we're really talking about is the period after the fall of 2012 going forward when it appears that Petroleum Solutions was getting into the fuel additive business on millers didn't have any connection with them after that. Your Honor, several responses to that line of questioning. First, we're not asking you to strictly construe these restrictions against the Millers. We're asking the court to give effect to the party's intent. Well, that's what you seem to think the intent is. The intent was that the Millers be out of the fuel additive business. The type of assistance... And they were after fall of 2012. And their only involvement before the fall of 2012 was to provide minimal assistance in the nature of professional advice and training to Kuhns, the buyer of Petroleum Solutions, while it was acting as your client's distributor. That can't possibly be a violation. They were acting as our distributor, but... But how could actions as a distributor be construed as engagement in the blending, packaging, marketing, what is it, selling, I guess, of chemical fuel additive products? How could that be? I mean, if the language is so broad as to exclude the distribution of ET products' own products, which is in furtherance rather than in competition with ET products, how could it ever be upheld as a valid non-compete agreement? It just... It's not hanging together for me either. Well, Your Honor, the facts of this case demonstrate exactly why a restriction assisting somebody that is even acting as a distributor for our own products is appropriate. Within a couple of months, somebody who had no experience in the fuel additive business is up and running and directly competing with us. They've sold nearly a million dollars of fuel additive. That's after this case... With the facts of this case. But the that's the point. The assistance that they were providing, even while they were a distributor, is what acted as the springboard to allow them to become... Right, but nobody knew at that point that you were going to cut them off. I'm sorry? Nobody knew at that point that you were going to cut them off as your distributor. So for you to argue that what the Millers did during the time that petroleum systems continued to act as your distributor somehow violated a non-compete when it actually benefited you. But, Your Honor, it's important that the court look at all of the violations together. All of these violations became connected in the fall of 2012 when Doug Miller took it upon himself to let John Coons know that Tom Patton, a former ET product salesman, whom Doug Miller knew was restricted by a non-compete and suggesting that he was available for hire. He hired him and Tom Patton then started competing directly with ET products, calling on ET products customers out in the market with the goal of outselling ET products and selling them at a deep discount in order to directly compete. Your Honor, there was no way for the Millers to unring that bell. Ms. Brady, did your opponent ever actually manufacture fuel products, gas products, the same product you were manufacturing? Yes, Your Honor. Is that in the record? Petroleum solutions. Yes, it's at page 23, which can be found at page 181 of the supplemental appendix. And they actually began to manufacture the same commodity you were making? Yes. The question, do you blend fuel additives? I'm sorry, do you blend additives? I do now. Question, when did you begin blending additives? Answer, several months after I was cut off from ET. He goes on to say that the way he was able to begin blending his own fuel additives was based upon the training that Doug Miller provided him. Now, the record shows that after you cut him off as a distributor, he did distribute a huge amount of fuel additives. Does the record indicate whose fuel additives they were? Were they ones that he manufactured, or were they ones that other companies manufactured, or both? I think that if you read page 23 of the deposition that I just cited to, which is at page 181 of the supplemental appendix, he was selling his own fuel additives. But honestly, Your Honor, it doesn't matter if he was selling his own fuel additives or if he was selling ABC's fuel additives. He was out there competing with ET products. So you read this agreement as forbidding him from distributing competition, competitors' fuel additives, even if he is not manufacturing fuel additives. Am I correct? Yes, Your Honor. And what do you do with the use of the conjunctive in the agreement? The use of the conjunctive term at the beginning of the agreement when they defined business, Your Honor, it was accurate. It states that the business is blending packaging, marketing, and selling fuel additives. That accurately described exactly what ET products was doing. But when we got to the restrictive covenants, it wasn't just restricted to the business. It went beyond that. But it talked about whether they were directly or indirectly. It wasn't the intent that ET products had a way of... I'm sorry to interrupt. Are you relying then on the word indirectly here? Yes, Your Honor. You are? Yes. Is that a plain language use of the word indirectly to be doing one of the four or five enumerated acts in the agreement in the conjunctive? Yes, Your Honor. I think it is because if they were required to be involved in all four, they would be a direct competitor anyway. Again, the intent of the parties was that the Millers not accept the $5 million from the Blakemore family and their investors and then turn around and across the parking lot set up somebody to start competing with them. They did not want the Millers out there in the business. They needed to be out of the business. As the Indiana courts found in Fogle v. Shaw, an individual should be entitled to sell their assets for a premium. And in order to get that premium, they should be able to offer a non-compete. And that's exactly what If I could just move your focus a little bit, I'm also concerned about the geographic breadth of the non-compete. It seems awfully broad to lock these folks up out of all of North America when, in fact, they were selling fuel additives in a 13 state area and one province of Canada at the time. I have two questions. First, can I look at what your client was doing at the time of the non-compete? There seems to be some significant authority that I'm not even allowed to look at that. And I'm concerned about it. And secondly, if I can look at it, how does it help your case if it helps it at all? In other words, what the expectation of the parties was. Yes, Your Honor. I think that the Indiana case law is clear. If you read Fogle v. Shaw, they say that you can look at the intent of the buyer as the relevant area of inquiry. Where the buyer or where the seller was selling is not relevant. The cases relied upon by the Millers are all where they're talking about restricting it to the buyer's current area of work. Those are all in the employment context. And those are not at issue here. And if you do consider the intent of the Blakemores, the materials that they provided to their investors were all about the fact that ET products had this excess capacity. And the Blakemore family's related entity of Fleet Chem had a significant contract with Cummins, and they were selling in 236 countries, I think, all over the U.S., 236 countries. They were poised to get these contracts with the TA and pilot truck stops to be able to sell the fuel. So your argument is that your client was, in fact, a world marketer? Yes, Your Honor. And that was their intent with this entity that they were buying. I see. Before you sit down, I have a question about what you're seeking in damages. Yes, Your Honor. Because what we're talking about here is not a claim against the competing entity. It's a claim against the Millers who aren't getting anything, any benefit from whatever competition Petroleum Solutions is engaged in now. The issue of damages was not at issue in the summary judgment. We were moving for partial summary judgment, hoping to leave the issue of damages for trial. But in response to your question, Your Honor, the damages are whatever damages flowed from the Millers breach. So if ET products lost the sale of fuel additives to Petroleum Solutions, then that lost profit is an element of damage that they're entitled to recover from the Millers. And all you're asking for at this point is that we send this back for review. Thank you. Now, Mr. Pruitt. Good morning. My name is David Pruitt, and I represent Doug and Tracy Miller in this case. Mr. Pruitt, while it's on my mind, may I ask you a question about whose intent I can look at to determine the legitimacy of the geographic breadth of this agreement? Your sister says that I can look under the Fogle case at the intent of the buyer, i.e., her client. Do you agree with that? There is that. It does say that in that case, Your Honor. But there is also case law that is out there that says that it should not be based on subjective intent. When you say out here? Out there in the state of Indiana? In the state of Indiana. I don't have that in front of me. It's subjective intent, but does it say I'm forbidden to look at the intent of the buyer as opposed to the intent, just looking at the intent of the seller? Yes, Your Honor. It does? Yes. That's my understanding. I'm not aware. I can't cite you to a case here, Your Honor. I'm generally aware of, I think, the cases that you're concerned about. But as I sit here today, Your Honor, I don't have a case in front of me. Thank you. Well, I've interfered with your beginning, so you go right ahead now. No, thank you, Your Honor. Take off where you wanted to. Thank you, Your Honor. I choose to follow up on the discussion that we've had thus far, and I'd like just to talk about our concerns with the overbreadth of the non-compete. And Judge Rodner, to your points, I think we have questions about the overbreadth of the activity restriction. And the nexus here, non-competes have to have a nexus. The legitimate protectable interest is either trade secrets, confidential information, or goodwill. And so, your point about delivering furniture, Justice Rodner, I had a couple of... I'm just a judge, a lowly judge. Okay. The justices are up there somewhere. Watching. Okay. I had a couple of examples with painting a building also fall within conduct that was prescribed by the non-compete as it's worded. And we certainly understand that in the sale of business context, these are giving more deference than the employment context. There's no dispute about that. We are not asking for a rewrite of non-compete law in Indiana, but FOGL does stand for the proposition that there do have to be limits. And here, as to the activity restriction, what's happened is there's not a nexus between the legitimate business interests that were purchased and the conduct that's prescribed. So that's why, in our opinion, the activity restriction is overbroad. And similarly to the geographic restriction, when you have a situation where at the time of purchase, 13 states were at issue, one province of Canada was at issue, and there was no business being done in Mexico, at that point, even with the deference given in the sale of business context, the language of the covenant stretches too far. If there was sufficient evidence that the lease was on more favorable terms, than the market value, after 2012, would that raise an issue of fact for trial here, assuming we do not find the agreement itself overbroad? I think, if I could, Your Honor, proceed in a couple of ways in responding to your question. The language of the agreement here is critically important. And so I think when we look at the recital of the business that's found on Supplemental Appendix 57, business is defined as business of blending, packaging, marketing, and selling chemical fuel additive products. And then there's a comma, and then it's with its primary focus on diesel fuel additives. So I think the problem here is that there hasn't been sufficient focus on the entirety of that clause, because there's simply no evidence, even today, in the record, that petroleum solutions has a primary focus on diesel fuel additives. It was a lubricant business, and that's what the record reflects that it has always been. To your point, Your Honor, then, it would be my position, respectfully, that it's not conduct that would be reached by this non-compete clause. And then as to the lease issue that you've raised, that lease was entered into in 2012 when the business was sold to Mr. Coombs by Doug Miller. And so at that time, there wasn't a violation of the lease. So I believe, I guess the remedy there would be to require Doug Miller to breach a lease to then become in compliance with a non-compete. And so I don't think that that would be a reasonable interpretation of the conduct in the lease that issue. Is there any dispute as to who suggested the $100,000 discount on the sale of property? And even if it was suggested by Blake Moore, why should that remove it from the language of the non-compete provision? You still have the overall issue of whether petroleum solutions, even today, would fall within the clause that's at issue here in the recital of the business. But leaving that aside, we do need to correct the record on that, Your Honor. I believe in Appellant's brief, there's a reference to a dispute with Tom Patton, and that led to the discussion that's at issue here. If we look at Supplemental Appendix 176, what actually happened, Your Honor, is that was an attempt to resolve this dispute. So there was a meeting between John Coons, Tom Blake Moore, and Doug Miller. And at that meeting, Mr. Blake Moore said, it would help us out if you would go ahead and sell the building for $250,000 to try to resolve this matter. And that's what Mr. Miller did. So he ended up selling it to John Coons for that price. And now it's, again, being turned around on him because it was requested by Mr. Blake Moore to try to resolve the dispute. Now they're trying to say, well, that's a violation. So they did terminate the lease by virtue of this sale of the property. They did. At that time, the property was sold in April of 2015. And that's reflected on Supplemental Appendix 176, Your Honor. But from the fall of 2012, when ET cut Petroleum Solutions off as its distributor, to that point in time, the lease was still in place. Right, Your Honor, that it had been entered into in January 1, 2012, and it continued forward. Right. It was entered into at a time that predated the dispute that gave rise to this litigation, frankly, when Petroleum Solutions was acting as ET's distributor, and the Millers were involved in giving advice in that context. Exactly, Your Honor. Exactly. Yes. So I think the problem, and I believe it was picked up in the earlier discussion, was if taken to its logical extreme, Doug Miller had violated his non-compete the moment he signed it back in 2011, because nothing had changed in either 2011 when he continued to operate Petroleum Solutions. So this idea that he's violating the non-compete by serving his distributor, it just doesn't hold together. No, that doesn't make any sense as a matter of law. But the real pressure point in this case is the post-fall of 2012 period after Petroleum Solutions was cut off. At that point, it's my understanding it's undisputed the Millers were no longer involved in giving any kind of advice or assistance in that sense, and that the only basis for the claim from that point on forward is the lease. So I believe there would be two issues, Your Honor, and they both relate to alleged conduct by Doug Miller. Tracy Miller is also a defendant in this case, and the reason that he's in the case, the basis for that is software training that he provided to Petroleum Solutions in 2012. And so that's the only reason that he's been in the case. Now, when we turn to the issues after termination of the relationship, we really have two issues, I believe, that have been identified by the appellant. And I believe one of them is the lease, this issue of the lease. And the second one is this sale of the property for $250,000. And so post-2012, those are the two issues that we really have to address. And so we have a pre-existing lease that was entered into before there was any dispute. And then somehow, because of actions taken by others, that puts the Millers and the Crosshairs potentially for this Hobbsian choice of, do I breach the lease or do I, quote, unquote, violate the non-compete? That, to me, I don't have a case for you, Your Honor, but that simply seems to be an untenable position to place a party when they didn't have a role in creating the issue there. Is that what distinguishes this case from the Coons case, which involved the covenantee in that, or covenantor in that case, the one who owed the duty of non-competition kicking out the holder of the non-compete from the property and then leasing it to a competitor? So that was affirmative conduct on the part of the person who owed the duty. Right. My understanding of that case, Your Honor, was Mr. Coons entered into, as a seller, entered into a non-compete in 2007. And then, ultimately then, it was in 2012 that there was conduct that led to a new lease at that time being entered into that. With a competitor. With a competitor, exactly. That served as a basis in that lawsuit to find a violation of the non-compete. Right. We've got a pre-existing lease here that was in no way a violation of the non-compete during the time that the parties were working together. No, I think that's right. So that's the way to distinguish. It was affirmative conduct on the part of Mr. Coons to then lease to a competitor based on the agreement the court found that that was a violation. I think that is different, respectfully, from the situation that we have here, Your Honor. So those are the two issues. Then we've already discussed this issue of the sale of the business, which, again, was an effort to try to resolve the issues between the parties. And so, again, respectfully, even if you got to the idea that Petroleum Solutions falls within the scope of the agreement, to then be penalized or put in the crosshairs to respond and request to try to resolve an issue, respectfully, doesn't seem to be a fair result. Is it agreed that Petroleum Solutions did get into the fuel additives business as a producer, a blender, and marketer after being cut off as ET's distributor? I believe that there is evidence that Mr. Coons says at some point in time he did blend fuel additives. I don't believe that the record would show that it ever became a primary focus, which is the part of the clause that follows the comma. And so, as the record stands here, whether they're selling fuel additives doesn't address the issue of whether there's been a primary focus of the fuel additives. So I think that's problematic based on the facts of this case. So I don't want to belabor the issues. I'm happy to answer any other questions. But at this time, Doug and Tracy Miller would ask that you affirm the judgment of the district court that granted our client summary judgment. Thank you, Mr. Pruitt. Thank you. Okay, Ms. Brady, how much time? Oh, well, please give her three minutes. Thank you, Your Honor. Briefly, just to start, with respect to Mr. Pruitt's challenges currently to try to contest the enforceability of the agreement, it's our position that their failure to file a notice of cross-appeal bars them from now seeking to expand the Miller's rights by arguing that the agreement was unenforceable. There's been a lot of focus on that. I don't view that as an expansion of rights. It's just a different grounds for affirmance. It would be an expansion of rights because if you find that it was unenforceable, then if ET products were to find additional violations, they would be without a remedy. The statute of limitations is still open. But there's been a lot of focus upon the fall of 2012 and almost a no harm, no foul approach to what occurred while Petroleum Solutions was simply distributing ET products. Fuel additives. The assistance that they provided took them right up to the point of being a competitor. This, the non-compete agreement. Took them right up to the point or did they cross that line? Well, I mean, if you're, I'm just saying they were able, they were competing at that time. Well, it took them up to the point of being a competitor. Your point is, the Millers set them up to go. Yes, Your Honor. That's exactly it. It wasn't that the Millers were allowed to be out there training everyone to become a fuel additive or begin, become a fuel additive distributor or manufacturer. And as long as they brought them up to that point and once they actually started doing it, that it was no harm. Again, this is what non-competes are made of. There was irreparable harm that occurred when the Millers were providing this assistance in 2012. But the Millers themselves operated petroleum systems for a full year before they sold to Koons. Yes. Were they in violation for that period? No, Your Honor. That wasn't the intent of the parties that the Millers were not able to act as a distributor for ET products because ET products had a full arsenal to be able to prohibit the Millers from going beyond simply serving as a distributor. Once the Millers sold petroleum solutions to Koons, that's when the assistance was prohibited. They were providing assistance to a third party. And that's what the intent of the parties was, that they're not out there creating new competition for ET products. They paid $5 million for the right to keep them out of the business for five years. This is not, this is not an employment context. This isn't the new salesman first day on the job and the employer says sign this non-compete agreement or you're fired. This was giving them $5 million to stay out of the business. And now it would result in undeserved forfeiture, Your Honor, if all of a sudden now you're saying the Millers are allowed to keep their $5 million while at the same time creating competition for ET products. It's against public policy to allow them to do that. With respect to the lease and signing the letter of credit, because Koons didn't have credit sufficient of his own, giving him the $100,000 discount, these are all independent violations. When he is acting as his banker, as his creditor, as his lessor, he has an opportunity every single month when that agreement, or when the payment is due, to offer them additional financial assistance. Indiana, I mean in the Koons v. EBI case, simply acting as a lessor, period, was enough to constitute a violation of a non-compete. I appreciate your time and we would ask you to affirm the court's finding that the non-compete is enforceable, but reverse the district court on the finding that the undisputed evidence did not demonstrate a violation. Thank you. Thank you. Thanks to both parties. This case will be taken under advisement and we're going to take a five-minute break, okay?